UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PASQUALE PATRICK SENATORE,<br><br>Petitioner,<br><br>v.<br><br>RAYTHEL FISCHER, Warden,<br><br>Respondent. | No. 2:18-cv-00325 DAD AC<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the initial petition, ECF No. 1, which challenges petitioner's 2013 conviction for rape and lewd and lascivious acts on a minor. Respondent has answered, ECF No. 13, and petitioner has filed a reply, ECF No. 15.

BACKGROUND

I.   Proceedings in the Trial Court

  A. Preliminary Proceedings

Petitioner was charged in El Dorado County with multiple counts of child sexual abuse. The criminal complaint was filed in 2002.  For reasons that will become clear, the case did not go to trial until 2013.

////

1

     B. <u>The Evidence Presented at Trial</u>[1]

         1. <u>Prosecution Case</u>

The jury was presented with evidence of the following facts. In 1991, petitioner moved in with his girlfriend Lisa and her eight-year-old daughter. The daughter, Jane Doe I, viewed petitioner as a father figure. In 1992, Jane Doe II was born to Lisa and petitioner.

One night in January 1997, when Lisa was out of the house, petitioner (then age 30) followed Doe I (then age 13) into her bedroom, pushed her onto the bed and kissed her on the mouth, trying to use his tongue.[2] Doe I panicked and tried to push him off. Petitioner left the room. Doe I stopped calling petitioner "daddy" for a while. A month later, at a friend's urging, Doe I related the incident to her mother, who did not believe it.

In early July 1998, when Doe I was 14, she and petitioner spent the night alone. They watched a scary movie in his bedroom. She went to sleep but awoke to petitioner rubbing her back. He rolled her over, tried to pull off her pants, got on top of her, and tried to insert his penis in her.[3] She felt his erect penis touching her vagina, but it did not penetrate. He kissed her on the mouth. She got away and locked herself in the bathroom.

The next day, petitioner pushed Doe I onto the bed, spread her legs, and had sexual intercourse with her, over her protests.[4]

The jury also heard evidence of uncharged acts involving Doe I. About a dozen times during the next few months, petitioner had intercourse with Doe I or masturbated on her body. Some incidents occurred in private homes when petitioner brought Doe I to help him in his job as a house painter, and no homeowner was present. On three occasions petitioner took Doe I to a hotel where he committed sexual acts. She kept a hotel brochure, a receipt for perfume he bought her, and a note he wrote to her stating, "I promise that it will be the last time."

////

---

[1] This summary is adapted from the opinion of the California Court of Appeal, Lodged Doc. 9 at 2-6 (ECF No. 14-9 at 3-7). The undersigned finds this statement of facts to be accurate.
[2] This incident was charged as Count 1, Cal. Penal Code § 288(a) (lewd act on a child under 14).
[3] This incident was charged as Count 2, Cal. Penal Code § 288(c) (lewd act on 14-year-old).
[4] This incident was charged as Count 3, Cal. Penal Code § 261(a)(2) (forcible rape).

Petitioner turned to his own biological daughter, Doe II, when she was five years old.[5] On multiple occasions, beginning when she was five, petitioner took a shower with her, touched her vaginal area, masturbated, and tried to get her to touch his erect penis, telling her it would be fun. On the last occasion, in July 1998, petitioner made Doe II touch his penis. She screamed and said she would tell her mother, but she did not tell her mother.

In 2000, Doe I got into an argument with her mother, revealed the sexual misconduct by petitioner, and showed her mother the hotel brochure, perfume receipt, and petitioner's note promising it would be the last time. Still, the victim's mother did nothing.

In November 2001, Doe I revealed the abuse to a school counselor, who reported it to law enforcement.

Sheriff's detectives in plainclothes and an unmarked car went to petitioner's home on January 30, 2002, but no one answered the door, so they left a business card and note asking him to call. He did not call. One of the detectives returned two weeks later. The card was gone. There were cars in the driveway and noise inside the house, but no one answered the door. A few days later, a person identifying himself as petitioner called the detective in response to the card. The detective said he wanted to speak with petitioner about a 1998 case in which petitioner was named as a witness. They arranged to meet on March 5, 2002, but petitioner called and cancelled, saying he was out of town. Petitioner did not return subsequent calls.

At 9:00 a.m. on May 3, 2002, detectives knocked on petitioner's door and heard barking dogs and movement inside the house. Lisa eventually answered the door and told them to wait there while she secured the dogs. When she returned minutes later, the detectives asked for petitioner. Lisa said he was in the bedroom getting dressed. She went to get him, then returned and said the sliding glass door was open and he had run out the back. The detectives verified that petitioner was not in the house or backyard. The dogs' attention was focused on the back fence. When Lisa later saw petitioner, his foot was broken and purple. When an investigator later came to photograph the fence, Lisa told him that petitioner broke the fence jumping over it. At trial,

---

[5] Counts 4 through 10 were for lewd acts upon Doe II, a child under age 14 (§ 288(a)).

Lisa said petitioner told her he broke his foot jumping over the fence.

A criminal complaint was filed the same day, May 3, 2002, and detectives obtained an arrest warrant. Petitioner hid out in Woodland for a while. Lisa saw him a few times. According to her, he said he was trying to hire an attorney in Sacramento. Petitioner later told Lisa he was going to New York to try to get the deed to his sister Patricia Boutsikakis's house in order to raise money for the $250,000 bail. He said he had a bus ticket from Reno to New York, so Lisa drove him to Reno. Lisa later went to New York, supposedly to get the deed to give to an attorney, though there was evidence she had other plans. Lisa took her son and Doe II to New York with her and stayed with Patricia and petitioner's mother for two weeks. Patricia would not provide the deed. Petitioner spent time with Lisa while she was in New York. Doe II had not known petitioner would be in New York and avoided contact with him. When Lisa and her children left, petitioner said he would return to California in three weeks to take care of the matter, but he did not return.

In New York, petitioner worked for Gary Crouse's painting business from 2001 until 2011, when he was arrested. Crouse testified he paid petitioner in cash because petitioner did not have identification to cash checks. Because petitioner did not drive, Crouse drove him to jobs. For the last couple of years, Crouse picked up petitioner at the home of "Carol," where it appeared he was living. Petitioner regularly read The New York Blotter's report of persons whom police were seeking.

In October 2011, a United States Marshal's Deputy began searching for petitioner. He learned that while petitioner was in New York, he did not have a New York driver's license, did not rent or own real property, and did not receive any government assistance.

On October 31, 2011, the Deputy Marshal met with petitioner's sister Patricia, who said she did not know where petitioner was and had no way to contact him. The agents contacted another sister, Darnel Reyes, who said the same thing. That same day, petitioner received a phone call while at work with Crouse. The call upset petitioner. The next day, petitioner had Carol bring him to the job site. Petitioner asked Crouse for a ride to New Jersey and for Crouse to use his license to check petitioner into a motel. Defendant told Crouse he needed a place to

stay for a while after arguing with Carol's landlord about petitioner's sisters causing a scene by coming to the house and arguing with Carol. Crouse used his driver's license to rent a New Jersey motel room for petitioner. Petitioner then missed work for a couple of weeks, saying he was sick. Crouse later filled out paperwork so petitioner could move to a studio apartment adjacent to and owned by the motel.

After interviewing Carol, the Deputy Marshal on December 12, 2011, followed Crouse to the motel and saw petitioner enter Crouse's van. The Deputy followed the van to a McDonald's, where it stopped and petitioner was arrested. Petitioner did not have any identification with him.

Sheriff's detectives learned that petitioner had been living at the motel under the name Patrick Sorrentino.

   2. <u>Defense Case</u>

Petitioner testified in his own defense. He acknowledged a 1999 conviction for welfare fraud. He denied all alleged sexual misconduct and accused Doe I and Doe II of lying.

Petitioner testified that when he was in California, he agreed to meet with the law enforcement officers who said it was about his being witness to an accident, but he missed the meeting because he was busy. He was planning on moving to New York, where his mother and sisters live and he used to live, because there was no work here. He denied being present when law enforcement officers knocked on his door on May 3, 2002, and he denied running out the back. He claimed he had left for New York two days earlier.

Petitioner said he tried to obtain a New York driver's license but could not, due to a license suspension in California. He believed he obtained a New York I.D. card but was not certain and did not have one "recently." He tried to open a checking account but was denied because he had bank accounts closed for insufficient funds and overdraft, had a car repossessed, and had bad credit. He did not rent an apartment because he stayed with relatives and friends. Lisa visited petitioner in New York. She and the children were supposed to move to New York eventually, but a few years later she met someone new and stayed in California.

Petitioner moved to the motel after a fight with Carol, with whom he had been living. Crouse filled out the registration because the motel owner demanded a New Jersey driver's

license.  Petitioner denied using the name Sorrentino.

Petitioner kept a low profile in New York, not because of the California matter but because he was afraid of the Mafia in New York.  Petitioner's parents had divorced when he was eight.  His father remarried and then got involved with organized crime.  Ten years later, petitioner's father testified in high-profile trials, including against John Gotti, sent multiple mobsters to prison, entered a witness protection program, and relocated to Utah.  Petitioner's uncle later followed suit, testifying against mobsters, and relocating to Sacramento under the witness protection program.  Petitioner moved from Brooklyn to Sacramento in 1990.  When petitioner returned to New York, he went to Staten Island, not Brooklyn, and lived a quiet life.

Petitioner's sisters, Patricia Boutsikakis and Darnel Reyes, testified that they knew nothing about the California criminal case.

### C. Outcome

The jury found petitioner guilty on all counts.  It also found true special allegations that he had committed offenses against more than one victim (Cal. Penal Code § 667.61).

The trial court sentenced petitioner to three years on Count 2 and consecutive terms of 15 years to life on each of the other nine counts, for an aggregate term of 138 years to life in prison.

## II. Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on December 13, 2016.  Lodged Doc. 9 (ECF No. 14-9).  The California Supreme Court denied review on February 22, 2017.  Lodged Doc. 11 (ECF No. 14-11).

Petitioner did not seek collateral relief in the state courts.

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

>determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. at 181-182. In other

words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. Richter, 562 U.S. at 102.

## DISCUSSION

I. Claim One: Exclusion of Defense Evidence

A. Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that his right to present a defense was violated by the trial court's exclusion of evidence that corroborated his testimony. The prosecution presented evidence suggesting that petitioner had been avoiding California authorities while in New York, to establish consciousness of guilt. To counter this theory, the defense proffered evidence that petitioner had maintained a low profile in New York to avoid retribution from members of organized crime.[6] In support of this argument, the defense sought to present petitioner's own testimony and that of his sisters regarding their family's mob connections, including that their father and uncle had both testified against mob bosses including John Gotti. Counsel argued the sisters' testimony was admissible for the non-hearsay purpose of corroborating petitioner's belief that his father was in trouble with the mob and that he might be in danger as a result.

The trial court asked on what basis the sisters would testify about their father's mob connections. Counsel replied, "Their father telling them that." 2 RT 334. He added that "[i]t was also in the newspaper and books. It was a big thing back in New York." Id. at 339. Defense counsel said the sisters would testify that they were also afraid, but not as afraid as petitioner because the sisters were married and had different surnames. Id.

---

[6] The transcript of the proffer and argument is at 2 RT 329-341 (Lodged Doc. 4, ECF No. 14-4 at 97-109). The court's ruling is at 2 RT 347-348 Lodged Doc. 4, ECF No. 14-4 at 115-116).

The trial court said its inclination was that the sisters' state of mind as to what took place was second-degree hearsay. Id. at 341. Petitioner could testify to his family's mob connections for the non-hearsay purpose of establishing his own state of mind. However, because the prosecutor did not intend to offer any evidence that petitioner's family did not testify against the mob, the sisters' testimony was inadmissible. The trial court ruled further that the sisters' testimony was inadmissible to support petitioner's state of mind, because it would be offered for the truth of the matter that his father and uncle were involved with organized crime and had testified against the mob. Id. at 341, 347-348.

### B. The Clearly Established Federal Law

The Constitution guarantees to criminal defendants the right to present a defense. Chambers v. Mississippi, 410 U.S. 284 (1973); Crane v. Kentucky, 476 U.S. 683, 690 (1986). State rules limiting the admissibility of defense evidence are constitutionally permissible as long as they are rationally related to the legitimate purpose of excluding evidence that has only a weak logical connection to the central issues at trial. Holmes v. South Carolina, 547 U.S. 319, 326-330 (2006).

### C. The State Court's Ruling

This claim was raised on direct appeal. Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned decision on the merits and is the subject of habeas review in this court. See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

The court of appeal ruled as follows:

> Defendant argues the question is whether the proffered evidence was hearsay, which is a question of law subject to de novo review. But defendant cites *People v. Cromer* (2001) 24 Cal.4th 889, 894, which merely said questions of law are reviewed de novo. A trial court has broad discretion in deciding the admissibility of all evidence, including hearsay evidence. (*People v. Beeler* (1995) 9 Cal.4th 953, 978, abrogation on other grounds recognized in *People v. Pearson* (2013) 56 Cal.4th 393, 462.) We review any trial court ruling on admissibility of evidence for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) Of course, the scope of discretion always resides in the particular law being applied, such that we determine as a question of law whether the trial court applied an

incorrect legal standard. (*People v. Parmar* (2001) 86 Cal.App.4th 781, 793.)

Defendant does not argue abuse of discretion but argues only that the trial court erred in concluding the proffered evidence was hearsay. However, defendant is wrong. The proffered evidence was hearsay.

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).)

Defendant argues a witness is not relating hearsay if the witness testifies about a fact from their own personal knowledge, and his "sisters would testify about their own experiences being raised in a family associated with organized crime, including their father and uncle having testified against John Gotti, being placed in witness protection, and the sisters' experiences of being taken by the FBI to meet their father in out-of-the-way places." He cites Evidence Code section 702: "(a) Subject to Section 801 [experts], the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter. Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter. [¶] (b) A witness' personal knowledge of a matter may be shown by any otherwise admissible evidence, including his own testimony."

However, defendant fails to show that either sister had personal knowledge of a mob connection. Defense counsel acknowledged the basis for the sisters' asserted knowledge was that their father told them so and it was in books and newspapers. This is all hearsay. The defense did not claim the sisters were in court during Gotti's trial to witness their father or uncle testifying, or that the sisters had any personal knowledge of a witness protection program. As to the proffer that the sisters would say the FBI took them to meet their father, there was no proffer that this would be anything more than hearsay as to the identity of any person as an FBI agent.

Defendant's own testimony about the mob connection was not hearsay because it was not used to prove the truth of that matter. The defense sought to use it only to show defendant's state of mind in lying low while in New York. It did not matter whether it was true; it only mattered whether he believed it to be true.

But the sisters' own beliefs as to the truth of the hearsay (assuming they held such beliefs) were irrelevant. There was no proffer that the sisters would testify they communicated such beliefs or fears to defendant, which might be relevant for a nonhearsay purpose of the effect of such messages on defendant's state of mind.

Defendant argues the prosecution would have been allowed to present testimony of his family members that he was not raised in a Mafia family, in order to rebut his state-of-mind evidence. (Evid. Code, § 780, subd. (i) [in determining credibility, jury may consider the "existence or nonexistence of any fact testified to by him"].) Defendant then jumps to the conclusion that "[f]or the same reason"

10

> he should be permitted to corroborate his own credibility. (Evid. Code, § 785 ["The credibility of a witness may be attacked or supported by any party, including the party calling him"].)
>
> However, even if defendant's sisters believed their family was involved in organized crime and their relatives testified against the mob, such that the sisters harbored fear about potential retribution, such feelings would be irrelevant to defendant's credibility about his own mindset, absent evidence that the sisters communicated their own beliefs or fears to defendant.
>
> The proffered evidence was hearsay, was not relevant or material, and was properly excluded by the trial court.
>
> Defendant argues exclusion of his sisters' testimony, which he views as relevant and material, impaired his federal constitutional right to present a defense. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636].) However, a criminal defendant does not have a federal constitutional right to present unreliable hearsay or irrelevant evidence, and a state court's application of ordinary rules of evidence generally does not infringe upon the right to present a defense (*People v. Linton* (2013) 56 Cal.4th 1146, 1183; *People v. Ayala* (2000) 23 Cal.4th 225, 269.) Defendant offers no constitutional argument other than to repeat his erroneous view that the excluded evidence was relevant and material.
>
> Since there was no error, we need not address defendant's claim that error was prejudicial.

Lodged Doc. 9 at 8-10 (ECF No. 14-9 at 9-11).

### D. Objective Reasonableness Under § 2254(d)

The state court's resolution of the hearsay issue was governed by state law. Even if the ruling had been incorrect, it would provide no basis for federal habeas relief. See <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

The appellate court summarily rejected petitioner's constitutional claim, a result which involved no objectively unreasonable application of clearly established federal law. Because petitioner was permitted to testify in support of his theory that he was "off the grid" in New York in order to avoid mob retaliation rather than to evade California law enforcement, he was not in fact prevented from pursuing that theory of defense. The United States Supreme Court has never held that the exclusion of merely corroborating defense evidence violates the Sixth Amendment. To the extent petitioner relies on such a proposition, he cannot prevail. See <u>Wright v. Van Patten</u>,

11

552 U.S. 120, 125-26 (2008) (per curiam) (if no Supreme Court precedent establishes the rule on which petitioner relies, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law).

To the contrary, it is clearly established that defense evidence may be excluded on grounds including marginal relevance. Holmes, 547 U.S. at 326-327 (quoting Crane, 476 U.S. at 689-690)). Here, the excluded testimony had little to no probative value as to petitioner's theory about his conduct in New York, for the same reasons that state hearsay rules compelled its exclusion. The sisters were not percipient witnesses to familial mob involvement or their father's or uncle's testimony against organized crime figures, so could not testify as to the truth of those claims. They had no evidence to offer about any statements they had made to petitioner that might have been admissible as to his state of mind. Their own states of mind cannot have been relevant to anything. On this record it was entirely reasonable for the state court to summarily reject the claim that this straightforward hearsay ruling impaired petitioner's right to present a defense.

This is not a case in which evidence was excluded pursuant to a rule that infringed on a weighty interest of the accused and was arbitrary or disproportionate to the purposes it was meant to serve. See, e.g., Rock v. Arkansas, 483 U.S. 44, 58, 56 (1987). To the contrary, the Supreme Court has recognized that hearsay rules are among the "familiar and unquestionably constitutional" evidentiary rules that may be used to exclude even relevant defense evidence. Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (plurality opinion).

For all these reasons, there was no unreasonable application of Supreme Court precedent by the state court. Federal habeas relief is therefore unavailable.

II. Claim Two: Sentencing Error

A. Petitioner's Allegations

Petitioner alleges that the trial court erred by imposing an indeterminate term of fifteen years to life on each of nine counts under the version of Cal. Penal Code § 667.61 that was in effect at the time of the offenses. He contends that the statute should have been interpreted as permitting only one indeterminate term per victim.

12

### B. This Claim is Not Cognizable in Federal Habeas

The federal petition, which incorporates the arguments from petitioner's opening brief on appeal, challenges petitioner's sentence as an erroneous application of California law; it contains no assertion of a federal constitutional violation. See ECF No. 1 at 17-22.[7] A state prisoner may seek federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Errors of state law do not come within the scope of federal habeas jurisdiction, and sentencing is a quintessentially state law matter that is not reviewable in federal habeas. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (habeas relief "is unavailable for alleged error in the interpretation of application of state law"); Miller v. Vasquez, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (questions of state sentencing law are not cognizable in federal habeas). Accordingly, this claim provides no basis for federal habeas relief.

### CONCLUSION

For all the reasons explained above, the state court's denial of Claim One was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d) and Claim Two does not present a cognizable claim for federal habeas relief. Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. See 28 U.S.C. § 2253(c)(2). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file

---

[7] The petition for review filed in the California Supreme Court also failed to assert any federal constitutional issue in relation to the sentencing challenge. See Lodged Doc. 10 (ECF No. 14-10 at 15-20).

objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 21, 2023

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE